IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

|  |  |  |
|---|---|---|
| RAMONA DUNCAN, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 09 C 2325 |
| v. | ) | |
| | ) | Judge Virginia M. Kendall |
| THOREK MEMORIAL HOSPITAL, an Illinois | ) | |
| Corporation, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Ramona Duncan ("Duncan") filed suit against Thorek Memorial Hospital ("Thorek") pursuant to the Age Discrimination in Employment Act, 29 U.S.C. § 621 *et seq.* ("ADEA"). Specifically, Duncan alleges in Count I that Thorek discriminated against her on the basis of her age in violation of the ADEA. In Count II, Duncan alleges that Thorek retaliated against her in violation of the ADEA. Thorek moves for summary judgment. For the following reasons, the Court grants Thorek's Motion for Summary Judgment.

## STATEMENT OF FACTS[1]

Duncan was born on August 31, 1932. (Def. 56.1 Resp. ¶ 1.) She was employed at Thorek, a Chicago medical institution, for thirteen years. (Pl. 56.1 Resp. ¶ 1.) At the time of Duncan's discharge from Thorek, in September 2007, she was seventy-five years old. (Def. 56.1 Resp. ¶ 1.)

Duncan began working at Thorek in 1994 as a Nursing Supervisor, a position she maintained

---

[1] Throughout this Opinion, the Court refers to the Parties' Local Rule 56.1 Statements of Undisputed Material Facts as follows: citations to Thorek's Local Rule 56.1(a)(3) Statement of Undisputed Facts have been abbreviated to "Def. 56.1 Ex. __."; citations to Duncan's Answers to Defendants' Local Rule 56.1(a)(3) Statement of Undisputed Facts have been abbreviated to "Pl. 56.1 Resp. ¶ __."; citations to Duncan's Statement of Additional Material Facts under LR. 56.1(b)(3)(C) have been abbreviated to "Pl. 56.1 Add. Facts Ex. __."; citations to Thorek's Response to Plaintiff's Statement of Additional Material Facts under LR. 56.1(b)(3)(C) have been abbreviated to "Def. 56.1 Resp. ¶ __."

throughout her employment. (Pl. 56.1 Resp. ¶¶ 5-6.) Prior to the fall of 2007, there were two daily weekday shifts for Nursing Supervisors. (*Id.* ¶ 17.) Duncan usually worked a set schedule of five eight-hour shifts per week, often from 11 p.m. to 7 a.m. (*Id.* ¶ 6.) Duncan routinely received positive performance reviews from her supervisors, who commented on her work ethic, knowledge, and skill. (*Id.* ¶ 10.)

Nursing Supervisors report directly to the Chief Nursing Officer ("CNO"), who is the highest ranking nurse at Thorek. (*Id.* ¶ 11.) Elise Teichman ("Teichman"), born on January 23, 1957, became interim CNO in February 2007 and later became the official CNO in March or April of that year. (*Id.* ¶ 12.) Teichman was responsible for scheduling the Nursing Supervisors. (Def. 56.1 Resp. ¶ 18.) Several Nursing Supervisors found Teichman a dedicated but intense person. (Pl. 56.1 Resp. ¶ 54.)

In March 2007, Nursing Supervisor Linda Lauzon ("Lauzon") gave Duncan a copy of a newspaper advertisement that Thorek had placed in *The Chicago Tribune*, seeking nursing candidates for different positions including Nurse Supervisors. (*Id.* ¶ 22.) This advertisement was part of a "block" advertisement that the hospital had purchased to see what type of candidates were in the job market. (*Id.* ¶ 23.)

## I.    Summer 2007 Scheduling

Duncan went on a three-week vacation from mid-June until July 4th or 5th, 2007. (*Id.* ¶ 25; R. 53-57, "Duncan Dep." at p. 52: 4-5.) On June 25, 2007, Thorek hired Cherry Simon-Cooley ("Cooley"), born on February 25, 1955, as a Nurse Supervisor. (*Id.* ¶ 24.) At the time Cooley was hired, the nursing department was short-staffed due in part to the medical restrictions placed on Nursing Supervisor Dolly Santos ("Santos"), who was born on September 5, 1941. (*Id.* ¶ 25.) Upon

her return from vacation, Duncan alleges that she was told that she had to share some of her work hours with Cooley. (*Id.*) Cooley ultimately took over Santos's hours and shifts because of Santos's medical restrictions. (*Id.*)

In the summer of 2007, Teichman discussed how to make the Nurse Supervisors's schedules more efficient with Frank Solare ("Solare"), Thorek's President and Chief Executive Officer. (*Id.* ¶ 28.) During these discussions, Teichman and Solare spoke of the possibility of moving the weekday Nurse Supervisors from eight-hour shifts to twelve-hour shifts, which were the same shifts that the weekend Nurse Supervisors were on. (*Id.* ¶ 29.)

Prior to the transition, Duncan had been working approximately forty hours per week. (*Id.* ¶ 37.) During the transition to twelve-hour shifts, which lasted from July through September 2007, Teichman occasionally reduced Duncan's hours. (*Id.* ¶ 35.) As a result, Duncan was scheduled to work between thirty-two and forty hours per week from July to September. (*Id.*) While Duncan's rate of pay and rate of vacation accrual remained the same during this period, because she was occasionally working fewer hours per week, she earned $930.35 less than she would have had she worked forty hours per week. (*Id.* ¶ 37.) Duncan also accrued 4.5 fewer vacation hours during this period than she would have had she been working forty hours every week. (*Id.*)

## II. Age-Related Comments

In July 2007, Lauzon told Duncan that Teichman had allegedly told other employees that Duncan's hours were being cut back to a part-time level due to Duncan's age. (*Id.* ¶ 41; Duncan Dep. at 51:8-16.) Nursing Supervisor Rosario Fordley ("Fordley"), born on October 23, 1935, told Duncan that she had heard other employees speculate that they thought Teichman was cutting Ducan's hours because of Duncan's age, but Fordley did not actually hear Teichman make these

comments. (*Id.* ¶ 42.) Duncan never heard Teichman make comments about wanting to hire younger employees to give them supervisory positions, though Duncan alleges other employees heard Teichman make these remarks. (*Id.* ¶ 46.)

At no point did Fordley, who was seventy-one years old during the summer of 2007, feel as if Teichman had taken any action against Fordley or treated Fordley differently because of Fordley's age. (*Id.* ¶ 43.) Santos, who was sixty-six years old in the summer of 2007, also felt that Teichman was accommodating to Santos, especially in light of Santos's disability. (*Id.* ¶ 44.)

Sometime in July 2007 Duncan complained to Fordley that she felt Thorek was "after her" because of her age. (Def. 56.1 Resp. ¶ 9.)

## III. Teichman's Actions

Duncan alleges that she complained to Teichman in July 2007 about age discrimination. (Pl. 56.1 Resp. ¶ 48.) Specifically, Ducan told Teichman that she felt Teichman had reduced her hours due to Duncan's age. (*Id.*) This was the only time that Duncan brought up age discrimination with a supervisor at Thorek.[2] (*Id.* ¶ 59.) Duncan alleges that Teichman's response to her complaint of discrimination was to say, "Oh, you and your discrimination" and then leave the room. (Def. 56.1 Resp. ¶ 13.) Teichman did not follow-up on Duncan's complaint and did not advise Duncan of any dispute resolution procedures that she could utilize. (*Id.* ¶ 14.) Teichman did not report Duncan's complaint to her supervisors. (*Id.* ¶ 13.) Conversely, when a different employee complained to Teichman about racially discriminatory behavior, Teichman investigated the behavior and advised Solare of the complaint. (*Id.* ¶ 36.)

Duncan alleges that after this conversation, Teichman continued to change Duncan's work

_____

[2] Duncan's informal complaints to her fellow Nursing Supervisors do not constitute complaints to a supervisor as the Nursing Supervisors were Duncan's colleagues.

schedule and also acted rudely to her on two separate occasions. (Pl. 56.1 Resp. ¶ 48.)

The first instance occurred when Teichman used her cell phone to call Duncan while Duncan was at work. (*Id*. ¶ 49.) When Duncan answered the phone, the call was not clear so Duncan asked the caller to identify herself. (*Id*.) In response, Teichman allegedly screamed at her, "This is Elise. Can you hear me now?" (*Id*.) Duncan found Teichman's tone belittling and harassing. (*Id*.)

The second occasion also occurred in July 2007. (*Id*. ¶ 50.) Duncan alleges that Teichman called her home while Duncan was asleep. (*Id*.) Duncan's husband answered the phone and Teichman instructed him to wake his wife up so she could speak to her. (*Id*.) Duncan's husband refused to wake up Duncan.[3] (*Id*.) Duncan found this entire incident harassing. (*Id*.)

Teichman made comments to and about other employees as well, telling them that they should not bother coming back to work if they called-in to try to take time off. (*Id*. ¶ 55.) She made these comments to employees both over and under the age of forty. (*Id*.)

For example, Teichman promoted Lonel Verdeflor ("Verdeflor"), born October 6, 1972, to unit manager of the ICU in spring 2008. (*Id*. ¶ 57.) When Verdeflor confronted Teichman and alleged that she had assigned him more work after he returned to his clinical nursing position, Teichman told him that if he was not happy then he should quit. (*Id*.) Duncan allegedly understood that Teichman also wanted to get rid of another employee, Soongil Park ("Park"), a nursing Manager at Thorek. (*Id*. ¶ 72.) When Park threatened to resign from Thorek, Solare and Peter Kamberos ("Kamberos"), Thorek's Chairman of the Board of Trustees since 1998, intervened and offered her a raise to stay. (*Id*.)

---

[3] Duncan alleges that she "once told Teichman that she felt Teichman had harassed her and her husband by calling her at home" but it is not clear when this conversation occurred or if it was part of Duncan's general complaint to Teichman in July 2007 about age discrimination. (*Id*. ¶ 50.)

During her tenure as CNO, Teichman hired eight new Nursing Supervisors, including: Esther Meadors (born January 18, 1961); Cooley (February 25, 1955); Barb Woodlow (August 10, 1949); Sharon Hinkle (June 18, 1958); Margaret Oshinowo (August 26, 1950); Paulette Car (September 9, 1958); Anjanette Miller (January 15, 1972); and Genevieve Presbitero (January 17, 1971). (*Id.* ¶ 78.)

Overall, Duncan had the perception that the nursing staff was unhappy with the way Teichman treated them. (*Id.* ¶ 58.)

## IV. Duncan's Discharge

After working two twelve hour shifts in two days, Duncan submitted her one-week notice of her intent to resign on or about September 7, 2007. (*Id.* ¶ 73.) In her notice, Duncan did not reference any allegations of harassment or discrimination. (*Id.*) Duncan alleges that when she spoke to Teichman about her intent to resign, Teichman offered her a part-time position with a higher salary but required Duncan to work twelve-hour shifts. (*Id.* ¶ 74.) Duncan refused the offer because she did not want to work part-time or work twelve-hours shifts. (*Id.*)

Teichman wrote on Duncan's Personnel Termination Form that Duncan decided to retire because she did not approve of her scheduled hours. (*Id.* ¶ 75.) Duncan met with Rachel Febo ("Febo") in Human Resources, who encouraged Duncan to put any concerns that she had in writing, but Duncan never did this. (*Id.* ¶ 77.) Duncan did not realize that her meeting with Febo was an exit interview. (*Id.*)

Duncan's former work hours were assumed by other Nursing Supervisors, including Park. (*Id.* ¶ 76.)

By the first week of November 2007, all of the Nursing Supervisors were working twelve-

hour shifts.  (*Id.* ¶ 40.)  Full-time Nursing Supervisors worked three twelve-hour shifts per week, and, as a result, no Nursing Supervisors worked the 11 p.m. to 7 a.m. shift.  (*Id.*)

Teichman resigned in May 2009.  (*Id.* ¶ 12.)

## STANDARD OF REVIEW

Summary judgment is proper when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  In determining whether a genuine issue of material fact exists, the Court must view the evidence and draw all reasonable inferences in favor of the party opposing the motion.  *See Bennington v. Caterpillar Inc.*, 275 F.3d 654, 658 (7th Cir. 2001); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  However, the Court will "limit its analysis of the facts on summary judgment to evidence that is properly identified and supported in the parties' [Local Rule 56.1] statement."  *Bordelon v. Chi. Sch. Reform Bd. Of Trs.*, 233 F.3d 524, 529 (7th Cir. 2000).  Where a proposed statement of fact is supported by the record and not adequately rebutted, the court will accept that statement as true for purposes of summary judgment.  An adequate rebuttal requires a citation to specific support in the record; an unsubstantiated denial is not adequate.  *See Albiero v. City of Kankakee*, 246 F.3d 927, 933 (7th Cir. 2001); *Drake v. Minn. Mining & Mfg. Co.*, 134 F.3d 878, 887 (7th Cir. 1998) ("Rule 56 demands something more specific than the bald assertion of the general truth of a particular matter[;] rather it requires affidavits that cite specific concrete facts establishing the existence of the truth of the matter asserted.").

## DISCUSSION

**I. Count I: Age Discrimination**

The ADEA prohibits employment discrimination against employees over the age of forty. *See* 29 U.S.C. § 621 *et seq.* Duncan alleges that, as a result of her age, she was demoted, received lower wages and fewer benefits, and was exposed to a hostile work environment by being verbally harassed and assigned to undesirable work shifts. Duncan further alleges that these conditions led to her constructive discharge.

To establish a violation of the ADEA, a plaintiff must demonstrate that she suffered an adverse employment action because of her age. *See Monaco v. Fuddruckers, Inc.*, 1 F.3d 658, 660 (7th Cir. 1993). A plaintiff must allege facts that age was the "but for" cause of the employer's adverse employment decision. *Gross v. FBL Fin. Servs., Inc.*, 129 S. Ct. 2343, 2350 (2009) (an act or omission is not considered a "but for" cause of an event if the event would have occurred without it). To do so, a plaintiff may show discrimination by utilizing either the direct or indirect methods of proof. *See Atanus v. Perry*, 520 F.3d 662, 672 (7th Cir. 2008).

Here, Duncan does not allege that she has established an unlawful discrimination claim through the direct method of proof. As such, the Court will only analyze her claim pursuant to the indirect method.

### A. Indirect Method

A plaintiff creates a presumption of unlawful discrimination under the indirect method by establishing a prima facie case of discrimination. *See Bahl v. Royal Indem. Co.*, 115 F.3d 1283, 1290 (7th Cir. 1997). To establish a prima facie case of discrimination under the ADEA, a plaintiff must put forth evidence that: (1) she belongs to a protected class; (2) she performed her job

according to her employer's legitimate expectations; (3) she suffered an adverse employment action; and (4) similarly situated employees outside the protected class were treated more favorably by the employer. *See Wyninger v. New Venture Gear, Inc.*, 361 F.3d 965, 978 (7th Cir. 2004). Summary judgment is appropriate if a plaintiff fails to establish any of these elements. *See Atanus*, 520 F.3d at 672. If, however, a plaintiff establishes each of these elements, she creates a presumption that shifts the burden to the employer to "produce a legitimate, noninvidious reason for its actions." *Id.* at 673. If the employer satisfies its burden of production and rebuts plaintiff's prima facie case of discrimination, the burden shifts back to the plaintiff to show that the employer's reasons are false and only a pretext for discrimination. *See id.* at 672.

Here, the parties agree that Duncan satisfies the first two elements—she belongs to a protected class by virtue of her age and she performed her job according to her employer's expectations, in many instances exceeding those expectations. The parties dispute whether Duncan suffered an adverse employment action and whether similarly situated employees outside of the protected class were treated more favorably.

### i. Adverse Employment Action

An adverse employment action is one where the conditions in which an employee works are changed in a way that subjects her to a humiliating, degrading, unsafe, unhealthful, or an otherwise significantly negative alteration in her workplace environment. *See O'Neal v. City of Chi.*, 392 F.3d 909, 911 (7th Cir. 2004). An adverse employment action must be materially adverse, not merely an inconvenience or a change in job responsibilities. *See Hilt-Dyson v. City of Chi.*, 282 F.3d 456, 465 (7th Cir. 2002). Not everything that makes an employee unhappy is an adverse employment action; an adverse action is one that significantly alters the terms and conditions of the employee's

job.  *See Stutler v. Ill. Dep't of Corr.*, 263 F.3d 698, 703 (7th Cir. 2001).

Here, Duncan alleges that she was demoted, that she lost wages and benefits, that she was forced to work in a hostile environment, and that she was constructively discharged.

### a.    Demotion and Lost Wages/Benefits

Duncan alleges that she was demoted from a full-time employee to a part-time employee because of her age and that as a result of her reduced work hours, she suffered reduced wages and benefits as well.

A "materially adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation." *Oest v. Ill. Dep't of Corr.*, 240 F.3d 605, 612-13 (7th Cir. 2001) (citation and quotation marks omitted); *Griffin v. Potter*, 356 F.3d 824, 829-30 (7th Cir. 2004) (noting that the denial of a raise can constitute a materially adverse employment action if that raise was "an expected element of the employee's salary and its denial cuts the salary in real terms.") (citation omitted).

Here, it is undisputed that Duncan suffered lost wages amounting to $930.35 from being scheduled to work fewer hours beginning in July 2007 through the end of her employment in September 2007.  It is also undisputed that Duncan lost the accrual of four-and-a-half vacation hours due to her reduced work schedule during the same time period.  *See id.; see, e.g., Tropp v. Ingalls Mem'l Hosp.*, 2007 WL 869555 at *10 (N.D. Ill. Mar. 21, 2007) (Der-Yeghiayan, J.) (finding that a "reduction in [plaintiff's work] hours caused a reduction in her pension, paid sick days, and paid vacation days" and therefore constituted an adverse employment action).

Duncan's reduction in total salary of $930.35, coupled with the loss of her vacation hours,

constitute a material loss.  While the parties dispute whether Duncan was officially demoted from a full-time employee to a part-time one, this dispute is immaterial because Duncan's resulting loss in wages and benefits constitute an adverse employment action.  Therefore, Duncan has satisfied the adverse employment element with respect to her lost wages and benefits.

### b.        Hostile Work Environment

A workplace is considered a hostile work environment where the harassment is sufficiently "severe or pervasive to alter the conditions of employment and create an abusive working environment." *Ezell v. Potter*, 400 F.3d 1041, 1047 (7th Cir. 2005).  A plaintiff must establish that the workplace was both subjectively and objectively offensive. *See Rogers*, 320 F.3d at 752.  A workplace is subjectively offensive when the plaintiff actually perceives it as such; it is objectively offensive when a reasonable person would find it hostile or abusive. *See Ezell*, 400 F.3d at 1047-48. The Court looks to the frequency of the discriminatory conduct, its severity, whether it is physically threatening or humiliating or a mere offensive utterance, and whether it unreasonably interferes with an employee's work performance. *See id*.

Generally, hostile comments do not qualify as actionable adverse employment actions unless the hostility was severe and pervasive. *See Hilt-Dyson*, 282 F.3d at 466.  Even if the Court finds that verbal comments were both severe and pervasive, the Court must still assess whether the statements were merely subjectively offensive or objectively offensive.  Rude and inappropriate comments are not necessarily severe enough to change the conditions of a plaintiff's employment. *See Ezell*, 400 F.3d at 1048 (ignorant stereotypes made by plaintiff's supervisor did not constitute a hostile work environment); *Racicot v. Wal-Mart Stores, Inc.*, 414 F.3d 675 (7th Cir. 2005) (boorish behavior is not necessarily age harassment).

Here, Duncan claims that she was forced to work five days in a row including two consecutive twelve hour shifts, that she received two harassing phone calls from her supervisor, and that she was told by others about discriminating remarks her supervisor allegedly made about her in the presence of other employees.

### 1. Work Schedule

Regarding her work schedule, Duncan does not allege that her rate of pay decreased or that her responsibilities changed. Duncan instead argues that she was occasionally assigned to a less desirable work shift, and had to work twelve-hours shifts when she was used to eight-hour ones. A change in a plaintiff's work schedule, however, does not support a claim of an adverse employment action. *Grube v. Lau Indus., Inc.*, 257 F.3d 723, 728 (7th Cir. 2001) (noting that an employer's "decision to change [plaintiff's] working hours certainly does not rise to the level of an adverse employment action."). Moreover, during the summer of 2007, all of Thorek's Nurse Supervisors were transitioning from eight-hour shifts to twelve-hour shifts. In addition, there is no evidence that Duncan's job duties, her rate of pay or rate of benefit accrual changed with her occasionally reduced hours. Therefore, Duncan is unable to claim that her new work schedule, unaccompanied by a reduction in her pay rate or a significant change in her job duties, constitutes an adverse employment action.[4] *See id*.

### 2. Harassing Phone Calls

Nor can Duncan maintain an adverse employment action claim based on the two allegedly harassing phone calls she received from her supervisor over the course of three months. As previously noted, hostile comments can only qualify as actionable adverse employment actions if

---

[4] The Court distinguishes between Duncan's rate of pay, which is not alleged to have decreased after July 2007, and her total pay, which decreased by over $930 after July 2007.

they are both severe and pervasive. *See Hilt-Dyson*, 282 F.3d at 466; *Speer v. Rand McNally & Co.*, 123 F.3d 658, 664 (7th Cir. 1997) (finding that plaintiff did not suffer an adverse employment action when her boss yelled at her and "did not make her feel as if she was part of the work group"). There is no evidence that the first phone call that Duncan complains of—where Teichman raised her voice to clarify who she was—implicates age discrimination or harassment. The second phone call—where Teichman called Duncan at home—was not even answered by Duncan, but rather was answered by Duncan's husband who informed Teichman that his wife was asleep; Duncan's husband did not wake up Duncan to inform her of the call. Taken together, these two phone calls over a three month period do not amount to severe or pervasive treatment, nor do they implicate age discrimination. *See Rizzo v. Sheahan*, 266 F.3d 705, 718 (7th Cir. 2001) (finding "threats, phone calls, and inconveniences [plaintiff] faced at work did not 'alter[] the terms or conditions' of her employment such that they can be characterized as adverse employment actions"); *Speer*, 123 F.3d at 664; *Oest*, 240 F.3d at 615 (uncorroborated generalities are insufficient to support an employment discrimination claim at summary judgment).

Moreover, during these three months that Duncan alleges that she was subject to a hostile work environment, there is no indication that the level of Duncan's job performance decreased or that she performed her job in an unsatisfactory manner. *See Griffin*, 356 F.3d at 830 (noting that a supervisor's alleged harassing conduct did not interfere with plaintiff's ability to do her job and therefore weighed against a finding of a hostile work environment) (citation omitted).

### 3. Teichman's Alleged Remarks

Duncan's adverse employment action based on alleged remarks that Teichman made about her in the presence of others fails for evidentiary reasons. Specifically, Duncan identifies statements

Teichman allegedly made, stating that Thorek needs younger Nurse Supervisors and that she was moving Duncan to a part-time schedule because of Duncan's age. These alleged statements, however, are hearsay within hearsay and each level of hearsay does not fall within a specific hearsay exception.[5] Fed. R. Evid. 805. Here, Duncan is alleging that someone else told her what Teichman allegedly told other people. While Teichman's statements to others may not be hearsay because they are arguably statements by a party opponent, the statements that the other employees made to Duncan about Teichman's comments are hearsay because they are being offered for the truth of the matter asserted in those statements. *See Halloway v. Milwaukee County*, 180 F.3d 820, 824-25 (7th Cir. 1999) (finding comments that plaintiff "alleg[ed] that someone else told him what another group of people said" constituted hearsay within hearsay and that the "outer" layer of hearsay—statements from the person relaying what he had overheard to the plaintiff—did not fall within the hearsay exception of being a party's agent). The statements that Duncan alleges Teichman told others are inadmissible, though the Court notes that even if they were admissible, they would not be severe or pervasive enough to qualify as creating a hostile work environment. *See Hilt-Dyson*, 282 F.3d at 466.

Therefore, Duncan is unable to demonstrate that Thorek or her supervisor created a hostile work environment by scheduling her into a new work schedule or by making two allegedly harassing phone calls during a three-month period.

### c.      Constructive Discharge

Constructive discharge, like actual discharge, is a materially adverse employment action. *See E.E.O.C. v. Univ. of Chi. Hosps.*, 276 F.3d 326, 331 (7th Cir. 2002). To demonstrate

---

[5] As discussed below, however, these statements are admissible to determine Duncan's state of mind regarding her constructive discharge claim.

constructive discharge, the plaintiff must show that she was forced to resign because her working conditions, from the standpoint of the reasonable employee, had become unbearable. *See Lindale v. Tokheim Corp.*, 145 F.3d 953, 955 (7th Cir.1998). An employee may demonstrate constructive discharge by claiming that she resigned because of discriminatory harassment, but her discriminatory work environment must be "even more egregious than the high standard for hostile work environment." *Tutman v. WBBM-TV, Inc.*, 209 F.3d 1044, 1050 (7th Cir. 2000), cert. denied, 531 U.S. 1078 (2001).

Alternatively, when an employer acts in a manner so as to have communicated to a reasonable employee that she will be terminated, and the plaintiff-employee resigns, the employer's conduct may amount to constructive discharge. *See Univ. of Chi. Hosps.*, 276 F.3d at 332; *Bragg v. Navistar Int'l Transp. Corp.*, 164 F.3d 373, 377 (7th Cir. 1998) ("Constructive discharge exists to give Title VII protection to a plaintiff who decides to quit rather than wait around to be fired."); *Hunt v. City of Markham, Ill.*, 219 F.3d 649, 655 (7th Cir. 2000) ("A person who is told repeatedly that he is not wanted, has no future, and can't count on ever getting another raise would not be acting unreasonably if he decided that to remain with this employer would necessarily be inconsistent with even a minimal sense of self-respect, and therefore intolerable.").

Here, as already discussed, Duncan is unable to demonstrate a hostile work environment and, as such, cannot demonstrate that she was forced to resign because her working conditions had become unreasonable and unbearable. *See Tutman*, 209 F.3d at 1050. Nor is Duncan able to demonstrate that she resigned based on a reasonable belief that she would have been terminated.

### 1. Reasonable Belief of Imminent Termination

As an initial matter, the Court notes that Teichman's alleged discriminatory statements to

other employees—that the Court deemed inadmissible in its analysis of Duncan's hostile work environment claim—are admissible in its consideration of Duncan's constructive discharge claim because the statements are not being offered for their truth, but rather to show Duncan's state of mind. *See Univ. of Chi. Hosps.*, 276 F.3d at 333 (allowing otherwise inadmissible hearsay statements to be considered in constructive discharge claim because they go to establishing the plaintiff's "state of mind" and do not bear on an issue of fact).

Duncan, however, does not present sufficient evidence to support her claim that she reasonably believed that she would be terminated from Thorek. General comments regarding the need to hire young nurses and a belief that her occasional reduction in work hours was based on her age, would not warrant a reasonable employee to think her termination was imminent. *Cf. id.*, 276 F.3d at 332 (finding that a reasonable employee would have quit where that employee faced open hostility for her religious beliefs, was told that a recent mistake was "the last straw," and returned to work to find that her belongings had been packed and her office was being used for storage). This is especially true when the company was transitioning Nurse Supervisors from eight-hour shifts to twelve-hours shifts. Duncan's demotion, if any, was not humiliating, nor was her reduction in wages "extreme." *Penn. State Police v. Suders*, 529 U.S. 129, 134 (2004) (employer may not assert the *Ellerth/Faragher* affirmative defense for constructive discharge where plaintiff quits her job "in reasonable response to a humiliating demotion, extreme cut in pay, or transfer to a position in which she would face unbearable working conditions."); *see, e.g., Tropp*, 2007 WL 869555 at *10 (finding that three reprimands by a supervisor and reduced work hours were insufficient for a plaintiff to reasonably claim that she thought she would be fired).

Similarly, the Court cannot credit that a reasonable employee would fear that they had "no

future" with their company because the company took out a block advertisement in a newspaper months earlier, announcing that it was looking to hire new employees. *See Hunt*, 219 F.3d at 655. Therefore, Duncan is not able to demonstrate that she was constructively discharged either due to unreasonable and unbearable working conditions or due to a reasonable belief that she would be terminated.

This conclusion is supported by Duncan's own deposition testimony, where she claims that after she told Teichman that she was going to quit, Teichman offered to pay her more money if she would stay on as a part-time Nurse Supervisor and work twelve-hour shifts. (Duncan Dep. 163: 13-17.) Duncan declined because the offer was only for a part-time position and was one that required twelve-hours shifts. *Id.* The Court notes that the reasons Duncan gave for refusing this offer are not indicative of someone forced to work in a hostile work environment or someone convinced that her employer was trying to force her to quit. Rather, it appears that Duncan's main points of contention with Thorek were over the number of hours she could work and whether those hours could be accommodated by an eight-hour shift instead of a twelve-hour one. Such conditions on re-employment undermine Duncan's claim that her workplace was otherwise unbearable or that she reasonably feared she had "no future" with Thorek and that her termination was imminent.

As such, the only adverse employment action that Duncan suffered is one based on her reduced wages and benefits upon her return from her July 2007 vacation.

### ii.     Similarly Situated Employees

To prevail on this element of the indirect method, a plaintiff must demonstrate that similarly situated employees outside of the protected class were treated more favorably than she was.

Here, it is undisputed that Duncan's supervisor demoted and reduced the hours of several

employees, regardless of their age. Duncan attempts to present her case as analogous to a "single-discharge" one, where a terminated-employee-plaintiff need not demonstrate that similarly situated employees were treated more favorably where the plaintiff's duties were "absorbed by other employees not in the protected class." *Bellaver v. Quanex Corp.*, 200 F.3d 485, 495 (7th Cir. 2000) (finding that in such a case, the plaintiff was effectively replaced, not eliminated, because the plaintiff's job duties were absorbed by others but the job itself was not eliminated). Duncan's reliance on *Bellaver* is misplaced because that case dealt specifically with a company's "reduction in force" action, and Duncan does not suggest that Thorek was engaged in a similar workforce reduction when Duncan was discharged. However, even if the Court were to treat Duncan's termination as a "single-discharge" and find that Duncan need not demonstrate that similarly situated employees were treated more favorably than she was, Duncan is nonetheless unable to present facts showing that Thorek's justifications for its actions were pretextual.

### iii.    Pretext

Even assuming Duncan was able to demonstrate that similarly situated employees fared better than she did, Thorek offered a legitimate non-discriminatory reason for its actions. Specifically, Thorek claims that it was in the process of shifting its Nurse Supervisors's schedules from eight-hour shifts to twelve-hour shifts, and that this process resulted in certain Nurse Supervisors having, temporarily, more flexible and fluid schedules and occasionally reduced weekly work hours. Duncan must therefore demonstrate that Thorek's proffered reasons are pretextual. *See Grube*, 257 F.3d at 730.

Pretext "means a dishonest explanation, a lie rather than an oddity or an error." *Kulumani v. Blue Cross Blue Shield Ass'n*, 224 F.3d 681, 685 (7th Cir. 2000). "A 'pretext for discrimination'

means more than an unusual act; it means something worse than a business error; 'pretext' means deceit used to cover one's tracks." *Id.* at 684. A plaintiff alleging pretext is required to establish that: (1) the proffered reasons are factually baseless; (2) the proffered reasons were not the actual motivation for the decision; or (3) the proffered reasons were insufficient to motivate the decision. *See Baron v. City of Highland Park*, 195 F.3d 333, 341 (7th Cir. 1999).

Here, the record demonstrates that Thorek and its administrators went out of their way to accommodate Duncan and her preference for an eight-hour work schedule while all of the other Nurse Supervisors were transitioning exclusively to twelve-hours shifts. While it is undisputed that Teichman eventually decided that Duncan's insistence on an eight-hour schedule and on forty hours of consistent work per week was unworkable during the transition period, there is no evidence that Duncan was singled out for her age.

Moreover, the majority of Duncan's fellow Nurse Supervisors were well over forty years old. While the Court agrees with Duncan that of those Nurse Supervisors over forty, many were still more than ten years younger than Duncan, their ages do not indicate a hostility towards older workers. In addition, there is no evidence that the reasons provided by Thorek were baseless; in fact, it is undisputed that within two months of Duncan's departure, Thorek's Nurse Supervisors were all on twelve-hour shifts.

Therefore, the undisputed facts demonstrate that Duncan was not discriminated against because of her age and Duncan cannot demonstrate that Thorek's proffered non-discriminatory reasons for her reduced wages and benefits were pretextual. As such, Duncan cannot support a claim of age discrimination pursuant to the ADEA.

**II. Count II: Retaliation**

Duncan claims that Thorek retaliated against her for complaining to her CNO about age discrimination. Here, Duncan raises claims under both the direct and indirect methods.

The ADEA prohibits employers from discriminating against employees who engage in a protected activity. *See* 29 U.S.C.A. § 623(d). Protected activities include those that employees engage in to oppose a practice made unlawful by the ADEA, including participating in investigations. *See id*. To demonstrate an adverse retaliatory action, a plaintiff must show that "a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67 (2006) (internal quotations omitted). Anti-retaliation statutes protect an individual from retaliation that produces an injury or a harm, not from all retaliation. *See id*. Snubbing, petty slights, and minor annoyances do not create such deterrence. *See id*. at 68-70.

## A. Protected Activity

Duncan claims that she spoke to Teichman, her immediate supervisor, regarding Duncan's fears that she was being discriminated against due to her age. Communicating discriminatory workplace conduct to an employer constitutes not only protected activity but opposition to the activity as well. *See Crawford v. Metro. Gov't of Nashville and Davidson County*, 129 S. Ct. 846, 850-51 (2009) (statute protects employees who communicate discrimination to employer; opposition to discrimination is implied). Therefore, Duncan's conversation wither her CNO, however brief, can be considered protected activity under the ADEA and was also in accordance with Thorek's

anti-discrimination policies.[6]  That Thorek failed to report Duncan's complaint higher up the company chain of command does not negate Duncan's engaging in a protected activity.

### B.  Direct Method

Having demonstrated a protected activity, Duncan must present evidence of an adverse action and a causal connection between that action and her protected activity.  *See Burks*, 464 F.3d at 758.  The Court has already determined that the only adverse employment action that Duncan can demonstrate relates to her reduced wages and benefits.  Therefore, to prevail under the direct method, Duncan must demonstrate a causal connection between her complaint to Teichman and Duncan's reduced work hours, which resulted in reduced wages and benefits.  *Oest*, 240 F.3d at 616 ("Speculation based on suspicious timing alone" does not support a reasonable inference of retaliation; a causal link, again, is required.") (citation omitted).

Here, Duncan is unable to demonstrate causation or suspicious timing because her hours were reduced and her wages and benefits lowered upon her return from vacation in July 2007, before she engaged in the protected activity of complaining to her supervisor.  *See Leitgen v. Franciscan Skemp Healthcare, Inc.*, 630 F.3d 668, 676 (7th Cir. 2011) ("When a retaliation claim is based on suspicious timing, the order of events is even more important than the time between them; the theory doesn't work if the retaliatory act precedes the protected activity.") (internal quotation marks and citations omitted).  To the extent that Duncan claims Teichman reacted to Duncan's complaint by creating a hostile work environment, these claims are unavailing because the Court has already determined that any subsequent harassment and rescheduling of Duncan's work hours did not

---

[6] The Court notes, however, that Duncan's complaints to her fellow Nurse Supervisors do not constitute a protected activity.  Nor does complaining to Thorek's Human Resources representative on her second-to-last day, after Duncan had already announced her resignation.

amount to an adverse employment action.

## C. Indirect Method

To prevail under the indirect method, Duncan must show that: (1) she engaged in statutorily protected activity; (2) she performed her job according to her employer's legitimate expectations; (3) despite meeting these expectations, she subsequently suffered a materially adverse employment action; and (4) she was treated less favorably than similarly situated employees who did not engage in statutorily protected activity. *See Atanus*, 520 F.3d at 677. "[F]ailure to satisfy any one element of the prima facie case is fatal to an employee's retaliation claim." *Hudson v. Chi. Transit Auth.*, 375 F.3d 552, 560 (7th Cir. 2004). As discussed, Duncan satisfied the first element by complaining to her supervisor; there is no dispute that she satisfied the second element; and the Court has already determined that her loss of wages and benefits constitute an adverse employment action. Duncan, however, is unable to demonstrate that this adverse employment action occurred after her complaint to Teichman. There is no evidence supporting a claim that Duncan's hours were reduced even more after she engaged in protected activity. As such, Duncan is unable to claim that she was retaliated against because her adverse employment action preceded her engagement in a protected activity. *See Leitgen*, 630 F.3d at 676.

Moreover, even if Duncan was able to demonstrate a subsequent adverse employment action in response to her protected activity, she does not present any evidence that similarly situated employees—those who had complained about discrimination but did not suffer an adverse employment action—were treated more favorably. *See Burks*, 464 F.3d at 751 (noting that similarly situated employees are those that are "directly comparable to her in all material respects"). There is reference to an employee who complained of racial discrimination, but no mention of the resulting

impact that engaging in protected activity had on that employee's workplace conditions.

In addition, even if the Court were to find that Duncan had established a prima facie case, Duncan is unable to demonstrate that Thorek's justification—its decision to switch all Nurse Supervisors from eight-hour shifts to twelve-hour shifts—was pretextual.

Therefore, Duncan cannot maintain a retaliation claim under either the direct or indirect methods.

## **CONCLUSION**

The Court finds that Duncan is unable to maintain an age discrimination claim or a retaliation claim pursuant to the ADEA. As such, the Court grants Thorek's Motion for Summary Judgment on Count I and Count II.


So ordered.



_____
Virginia M. Kendall
United States District Court Judge
Northern District of Illinois

Date: March 21, 2011